PREGERSON, J.,
concurring in part and dissenting in part:
I write separately because I am troubled by the LAPD officers’ actions in this case. The facts reveal numerous instances in which Lois Goodman was mistreated and humiliated by officers who had to know that their case against her was weak.
On the evening of April 17, 2012, 70-year-old Mrs. Goodman arrived home around 7:30 p.m. to find blood in the entry hall, in the kitchen, and on the stairs leading up to her and her husband’s bedroom. She also saw a broken coffee mug lying in a pool of blood on the staircase.
Mrs. Goodman rushed upstairs to the bedroom and found Mr. Goodman lying lifeless on their bed. He had gashes on his head and was covered in blood. Mrs. Goodman immediately called 911, saying “it looks like my husband fell on the steps.”
At the time, Mr. Goodman was 80 years old. His health had been steadily declining. He suffered from high blood pressure and diabetes. He had tremors in his left hand. He was depressed and often got disoriented. He was also losing his vision.
LAPD officers quickly responded to Mrs. Goodman’s 911 call. The officers were initially alarmed by the amount of blood throughout the Goodmans’ home. They saw blood in the kitchen, on the stairs, and in the master bedroom. There was blood on a carton of buttermilk in the refrigerator. No officer saw blood spatter on the walls of the dwelling, which would indicate an assault.
After investigating the scene, the officers listed Mr. Goodman’s cause of death as “accidental/head injury” on their Death Investigation Report. The officers based this conclusion on Mr. Goodman’s age, medical condition, and the lack of signs of forced entry into the Goodmans’ home. One officer observed, “[there was] no evidence of foul play .... The decedent possibly] fell down his sta[i]rs, cut his head on a broken ceramic cup and ble[d] out in his bedroom.”
On April 20, 2012, three days after Mr. Goodman’s death, a coroner investigator examined his body at a local mortuary. The investigator saw several deep lacerations on the right side of Mr. Goodman’s head and above his right eyebrow. Believing these injuries to be inconsistent with an accidental fall, the investigator transferred the body to the Los Angeles County Coroner’s Office.
Over the ensuing weeks, LAPD Detectives Jeffrey Briscoe, David Peteque, Nick Pikor, and Pamela Pitcher sought and obtained multiple search warrants on the Goodmans’ home. They continued to search for, but found no evidence of blood spatter. Mrs. Goodman cooperated with each search.
Mrs. Goodman also voluntarily appeared for three interviews. Each time, she told the officers that on the day Mr. Goodman died, they went to a doctor’s appointment, the car wash, and lunch. They arrived *892 home around 12:45 p.m. Mrs. Goodman then changed into her tennis umpire’s uniform and left around 1:15 p.m. to officiate nine college tennis matches at Pierce College in Woodland Hills. Afterwards, she went to the nail salon, then drove home. She arrived home around 7:30 p.m. to find Mr. Goodman dead. She called 911 at 7:32 p.m. The officers corroborated this time-line.
The officers also interviewed the Good-mans’ family, friends, and doctors. Mr. Goodman’s Veteran’s Administration Hospital doctor told Detective Peteque that four years earlier, in 2008, he filed an Adult Protective Services complaint naming Mrs. Goodman as a suspect for neglect. However, the complaint never resulted in a criminal investigation. Mr, Goodman’s podiatrist told Detectives Pikor and Peteque that she “sensed tension” between the Goodmans when she saw them the day Mr. Goodman died. But the Goodmans’ daughters told Detectives Pitcher and Pikor that their parents’ relationship was fine. The Goodmans’ son-in-law described them as “pretty damn happy.”
On April 24, 2012, one week after Mr. Goodman’s death, Deputy Medical Examiner Dr. Yulai Wang conducted the autopsy. Dr. Wang recorded multiple wounds on Mr. Goodman’s head, and found mug fragments inside some of them. After the autopsy, Dr. Wang described the “manner of death” as “pending investigation” so that he could conduct further investigation and testing.
Between April and August 2012, Detectives Briscoe and Peteque communicated with Dr. Wang’s office at least'20 times. Detective Peteque repeatedly asked “how long it will take to close [the] case.” He also told Dr. Wang’s assistant that the “DA is waiting on [the coroner’s] determination.”
On August 7, 2012 — more than three months after the autopsy and more than one. month after the test results, death scene photos, and medical files. became available — Dr. Wang changed the manner of Mr. Goodman’s death on his autopsy report from “pending investigation” to “homicide.” Dr. Wang did not explain why he made this change, despite national guidelines requiring coroners to explain changes in death classification. Dr. Wang also failed to state that some of Mr. Goodman’s injuries were consistent with an accidental fall.
On August 14, 2012, Detectives Peteque and Briscoe presented their investigation to Los Angeles County Deputy District Attorney Lisa Tanner for filing consideration. The officers’ theory was that Mrs. Goodman killed her husband by repeatedly striking him in the head with a coffee mug. DA Tanner reviewed the investigative materials for “an hour or two hours,” and then filed a “Felony Complaint for Arrest Warrant” for murder against Lois.
Later that day, Detective Briscoe presented DA Tanner’s felony complaint, along with his own “Declaration for Arrest Warrant,” to a Los Angeles County Superior Court judge. Neither the felony complaint, nor the declaration, contained detailed facts about the investigation. Instead, Detective Briscoe’s declaration referred to “5 Books,” which he allegedly presented to the judge. Although the contents of the five murder books are disputed, at least one report — Detective Briscoe’s August 14, 2012 “Follow-Up Investigation Report” — fails-to mention that Mrs. Goodman’s fingerprints were not on the coffee mug (the alleged murder weapon). The report also leaves out that some of Mr. Goodman’s injuries were consistent with an accidental fall, and that the officers repeatedly searched for, but found no blood spatter. Lastly, the report *893 states that Mrs. Goodman was “calm” and “was not crying” on the night Mr. Goodman died. But Mrs. Goodman disputes this, and provides evidence that she “sobbed,” was “very upset,” and was “in a state of shock.”
Not only did Detective Briscoe apply for an arrest warrant, he requested an arrest warrant with full extradition. He based this request on his alleged belief that, as of August 14, 2012, Mrs. Goodman was in New York, would remain there for “the next two months,” and had “a valid passport thus making her a flight risk to nearby Canada.”
Mrs. Goodman did indeed have plans to travel to New York to officiate at the U.S. Open. However, she planned to leave on August 19, 2012 (not August 14) and return on September 5, 2012. Additionally, her passport had expired in 1997, Mrs. Goodman claims that on August 10, 2012, her attorney called Detective Peteque to inform him of her upcoming travel plans. Mrs. Goodman also claims that, over the course of the investigation, she repeatedly offered to surrender herself in the event that the LAPD decided to arrest her.
Nonetheless, based on Detective Bris-coe’s representations that Mrs. Goodman was already in New York and that she was a “flight risk,” the Superior Court judge issued an arrest warrant with full extradition on August 14, 2012. Five days later, on August 19, 2012, Detectives Briscoe and Peteque traveled from Los Angeles to New York. Notably, this was the same day that Mrs. Goodman traveled from Los An-geles to New York. In fact, Mrs. Goodman’s flight departed 10 hours after the officers’ flight.
When Detectives Peteque and Briscoe arrived in New York on August 19, 2012, they sought assistance from the New York City Police Department. Two days later, on the morning of August 21, Detectives Briscoe and Peteque publicly arrested Mrs. Goodman as she left her Manhattan hotel, clad in her U.S. Open umpire’s uniform.
A horde of news media captured Mrs. Goodman’s arrest. Reporters photographed and videotaped officers handcuffing Mrs. Goodman and forcibly leading her to a police car. At the direction of his LAPD supervisors, Detective Peteque appeared on Good Morning America the following morning to recount the investigation.
After her arrest, the officers locked Mrs. Goodman up for two nights in Rikers Island, a New York City jail renowned for its deep-seated culture of gruesome violence.[1]
Detectives Briscoe and Peteque then flew Mrs. Goodman to Los Angeles. She remained in handcuffs the entire flight. Mrs. Goodman spent the next two weeks at the Century Regional Detention Facility in Lynwood, California. Her family was only able to post bail after a judge reduced the original bail amount of $1,000,000, to $500,000.
On September ■ 17, 2012, about one month after Mrs. Goodman’s arrest, LAPD lab tests showed that only Mr. Goodman’s DNA — not Mrs. Goodman’s — was on the coffee mug (the alleged murder weapon). Lab tests also showed that Mr. Goodman’s blood was not on the clothing Mrs. Goodman wore the day he died. On October 2, 2012, Mrs. Goodman passed a polygraph examination.
In November 2012, DA Tanner retained two experts to review the evidence: San *894 Bernardino County Chief Medical Examiner Dr. Frank Sheridan and Crime Scene Reconstructionist Dr. Tom Bevel. Dr. Sheridan concluded that “[t]he manner of death is an accident.” He also stated that parts of Dr. Wang’s autopsy report were “extreme[ly] below standard.” Similarly, Dr. Bevel concluded:
There is merit in the original assessment that Mr. Goodman fell on the stairs and injured himself on the broken coffee cup fragments. The evidence supports this as a better explanation than one where the victim was beaten as there is no spatter or cast-off stains consistent with such an action in this scene.
On November 80, 2012, DA Tanner dismissed the criminal case against Mrs. Goodman without prejudice. The stated reason for the dismissal was that based on Dr. Sheridan’s and Dr. Bevel’s “new analysis of the evidence, the People concluded that the case could not be proved beyond a reasonable doubt at this time.”
Nothing in the record indicates that the LAPD is conducting further investigation into Mr. Goodman’s death. But, because the charges against Mrs. Goodman were dismissed without prejudice, this case continues to plague her.
In my view, no reasonable officer could have believed there was probable cause to arrest Mrs. Goodman for murder. I cannot join in holding Detectives Briscoe, Pe-teque, Pikor, and Pitcher unaccountable for their actions. Respectfully, I dissent from the decision to grant these officers qualified immunity.

. See, e.g., Winnie Hu & Kate Pastor, Trial of 5 Rikers Guards Brings Out Culture of Violence at Jail, N.Y. Times (June 8, 2016), https://www.nytimes.com/2016/06/09/ nyregion/trial-of-5-rikers-guards-broughtout-culture-of-violence-at-jail.html?mcubz=0.